UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DESTINY GOSS O.B.O.<br>ANTHONY GOSS, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 1:19-cv-374-PPS<br>) |
| ANDREW M. SAUL,<br>Commissioner of<br>Social Security, | )<br>)<br>)<br>) |
| Defendant. | )<br>) |

## **OPINION AND ORDER**

Destiny Goss, acting on behalf of Anthony Goss[1], has appealed from an administrative law judge's partial denial of Anthony's application, granting him Period of Disability benefits for November 20, 2015 to May 4, 2017, but denying his application for ongoing Social Security disability insurance benefits. In his appeal he argues the ALJ improperly determined his Residual Function Capacity as of May 4, 2017, particularly as it relates to Goss's headaches and diabetes. As discussed below, neither of these two arguments warrant a reversal of the ALJ's decision and accordingly I will affirm.

## **Background**

Anthony Goss applied for Social Security Disability benefits on November 26,

---

[1] Anthony Goss passed away during the pendency of this social security appeal and his wife, Destiny Goss, has continued the action. [DE 1 at ¶ 2.] The cause of his death is unclear. For convenience's sake, and to avoid any confusion, this opinion will use "Goss" to refer to Anthony Goss and likewise uses male pronouns to refer to him, even if Destiny Goss is now the nominal plaintiff in the case.

2016, alleging that he was disabled beginning on or around November 20, 2015, when he stopped working due to a broken right foot. [A.R.[2] 32.] Goss had a hearing before an ALJ on September 5, 2017. [*Id.*] On September 27, 2018 (nearly two months after Mr. Goss passed away), the ALJ issued a written decision that was a mixed result for Goss. The ALJ agreed that Goss was disabled for the period of November 20, 2015 to May 4, 2017 and awarded him benefits for that period. [A.R. 39.] But the ALJ denied Goss's application for continuing Social Security disability insurance benefits, finding that Gross was not disabled as of May 4, 2017. The ALJ found Goss's health had improved to the point that he could go back to work. [A.R. 46.] That decision was affirmed by the Appeals Council. The ALJ's reasoning for those decisions was as follows.

After concluding Goss met the insurability and lack of gainful employment prerequisites, the ALJ dove into Goss's health and impairments. For the close-ended period of November 20, 2015 to May 4, 2017, the ALJ determined Goss had the severe impairments of scrotal cellulitis and obesity. [A.R. 36.] Goss's BMI ranged from 40 to 48, which is above the threshold for morbid obesity. Goss was hospitalized multiple times in 2015 and 2016 as a result of his scrotal cellulitis. In February 2017, Goss had significant surgery (and a lengthy recovery) to address lymphedema (swelling) in the area and had skin grafts on his penis and scrotum. [A.R. 37-38.] The ALJ likewise noted that Goss had other impairments, "including a history of bilateral feet fractures,

---

[2] The Administrative Record (A.R.) in this case is found at Docket Entry # 6. Citations are to the page number in the lower right-hand corner of the A.R.

headaches, fatigue, hypertension, right knee problems, diabetes mellitus, hypothyroidism, low testosterone, acid reflux, and depression." [A.R. 36.] But the ALJ found "analysis of these impairments is not necessary" because Goss could be found disabled as based solely on his scrotal cellulitis and obesity. That finding was not based on Goss meeting any of the applicable Social Security listings which create a presumption of disability. [*Id.*]

Instead, the ALJ proceeded to the next stage of analysis and determined Goss's Residual Functional Capacity (RFC) as a result of his impairments. Based on a review of the record for the close ended period, Goss could perform "light work" subject to additional specific limitations. Light work is defined as work requiring "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The additional limitations imposed included no climbing of ladders, ropes, scaffolds, ramps or stairs, and "only occasional" balancing, stooping, kneeling, crouching or crawling. [A.R. 37] Additionally, Goss could not work on slippery or uneven surfaces, at unprotected heights, around dangerous machinery, or operate a motor vehicle as part of a job. In addition, and ultimately dispositive for the finding of disability in this period, the ALJ noted that Goss would have been absent at least 10-12 days a year due to "his frequent impatient hospitalizations for scrotal cellulitis and groin area surgery and

subsequent recovery period." [*Id.*] As a result of this RFC, the ALJ determined Goss could not perform his past work and that there were no other jobs he could perform between November 20, 2015 and May 4, 2017. [A.R. 38.] He was thus found disabled during that period.

For the period after May 4, 2017, the ALJ reassessed Goss's status. The ALJ determined Goss had the following severe impairments at that point in time: status post bilateral foot fractures (resulting from injuries to his left foot in January 2015 and to his right foot in November 2015 and September 2017), obesity, headaches, fatigue, and groin problems as a result of his scrotal cellulitis surgery. [A.R. 39.] The ALJ also noted that Goss had the additional non-severe impairments of hypertension, right knee problems, diabetes mellitus, hypothyroidism, low testosterone, acid reflux, and depression. [*Id.*] On the diabetes in particular, the ALJ found it to be non-severe because the record did not contain "any significant diabetes-related complications, such as retinopathy, neuropathy, or nephropathy" and Goss's AIC was "almost always 8.0% or less since November 2015." [A.R. 40.]

With those impairments in mind, the ALJ's revised RFC for the post-May 4, 2017 period again limited Goss to "light work" and had the same additional limitations, except for it included no limitation of absenteeism of 10-12 times per year. [A.R. 24.] There was no limitation for any absenteeism or other additional limitations on account of the additional and/or different severe impairments noted. The ALJ determined that Goss's scrotal cellulitis no longer required inpatient hospitalization, surgery or

significant recovery after May 4, 2017, and thus chronic absenteeism would no longer be an issue.

That said, Goss testified to ongoing pain, discomfort, and complications relating to his groin surgeries for his scrotal cellulitis and foot injuries. He said that he had headaches which were so bad that they made him nauseous and/or caused vomiting three or four times per week. [A.R. 42-43.] Goss's wife testified similarly to the limitations imposed by her husband's conditions. The ALJ discounted the "intensity, persistence and limiting effects" of Goss's symptoms as "not entirely consistent with the medical evidence." [A.R. 43.] The ALJ also discounted Mrs. Goss's testimony concerning her husband's activity levels. The ALJ found she "is likely not well qualified to comment on the claimant's impairments" because she wasn't a medical expert. [A.R. 44.] The ALJ likewise found that because she was the claimant's wife, she "is not likely to be a particularly objective reporter on the claimant's impairments and limitations" and presumably disregarded her testimony or gave it very little weight. [A.R. 44.]

The ALJ also pointed to underlying medical evidence that undercut and contradicted Goss's testimony concerning his symptoms. The ALJ found there was "no evidence in the record that the claimant's left foot fracture failed to heal properly within 12 months" of his injury in January 2015. [A.R. 44.] Concerning Goss's right foot (injured twice), the ALJ found the fracture had "fully healed" by September 2016. The ALJ specifically pointed to doctor's opinions concerning Goss's foot fractures that he could return to work in June 2015 and October 2016. [A.R. 44-5.] The ALJ noted that

there was "no evidence" that Goss's foot hadn't healed within 12 months after Goss's accident in September 2017 in which he accidentally shot himself in the right foot. [A.R. 44.] This injury was considered basically a non-issue, both by the ALJ and in Goss in his appeal briefing. Lastly, the ALJ noted "the record contains no evidence that he has any significant diabetes-related complications such as retinopathy, neuropathy, or nephropathy." [A.R. 40.]

Regarding headaches, the ALJ noted that while Goss referred to them as migraines in his testimony, there was no diagnosis of migraines in the record. Instead they were described as "tension headaches" in the medical records. [A.R. 45.] The ALJ likewise noted that Goss took medications for headaches (Topamax and Flexeril) and they seemed to control the headaches somewhat as there were no medical records indicating changes in their dosage or substitution. [*Id.*] The ALJ likewise noted Goss had not sought emergency room or hospitalization for his headaches and noted that a CT scan from December 2016 did not illuminate anything about Goss's headaches. [*Id.*] The ALJ discounted Goss's fatigue for similar reasons, finding that he took Adderall for it and there had not been any changes in his medication levels or emergency room visits.

The final impairment addressed by the ALJ was Goss's groin problems relating to his scrotal cellulitis. The ALJ focused on how when, in May 2017, Goss went to his plastic surgeon's office it was noted that his skin grafts had healed. [A.R. 45, 695-97.] The records stated Goss still had lymphedema (swelling) in the area and should look

into a compression garment to bring down swelling, specifically on the penile shaft. [*Id.*] But that was it. Goss's urologist stated in June 2017 that Goss's skin grafts on his scrotum, penile shaft, and groin looked "quite well." [A.R. 45, 742.] And there were no additional follow-ups or complications noted in the record.

Based on the post-May 4, 2017 RFC, the ALJ determined Goss could still not return to his past work, as a farm laborer, screw machine setup operator, welding machine operator, or hand filer, all of which he had performed at a "heavy exertional" level. [*see* A.R. 38.] The ALJ then asked the vocational expert what jobs would theoretically exist for a person with the RFC the ALJ formulated—again it was the same RFC as for the close-ended period but without any absenteeism. The vocational expert testified that given the RFC/hypothetical, there were other "light work" jobs that Goss could perform, specifically those of unskilled occupations, such as "hand packager," "mail sorter," and "office helper." [A.R. 46.] Accordingly, the ALJ found that Goss was not disabled as of May 4, 2017 and denied his application for benefits beyond that point.

## Discussion

In a Social Security disability appeal, my role as district court judge is limited. I do not review evidence and determine in the first instance whether a claimant is disabled and entitled to benefits. Instead, I review the ALJ's written decision to determine whether the ALJ applied the correct legal standards and whether the decision's factual determinations are supported by substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). If substantial evidence supports the ALJ's

factual findings, they are conclusive. *Id.*; 42 U.S.C. § 405(g). The Supreme Court has said that "substantial evidence" means more than a "scintilla" of evidence, but less than a preponderance of the evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). "The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and the conclusions so that [I] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Given this modest standard, the review is a light one, but I do not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "[T]he decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003)).

Notwithstanding Goss's substantial health issues, his appeal is limited. He focuses exclusively on the ALJ's analysis of his headaches and diabetes, and their impact on his functionality. [DE at 12 at 4 (stating that the issue on appeal is "Whether the ALJ errs by failing to find limitations for the headaches, and interrelated impairments in combination in the RFC and its analysis otherwise?"). Notably, Goss's appeal does not implicate or discuss any particular symptoms or limitations from Goss's testicular cellulitis, obesity, or foot issues, and does not argue the ALJ made any

-8-

errors in that regard, except as to postulate that because of Goss's diabetes he was a "slow healer," as discussed below. [DE 12 at 13.][3]

First, I will address Goss's arguments relating to the symptoms and effects of his headaches. Goss testified at the hearing that he had "horrible migraine headaches" three to four days a week since 2016. [A.R. 71-73.] But a claimant's subjective complaints, on their own, cannot be the basis for a finding of disability. 20 C.F.R. § 404.1529(a). A claimant must furnish evidence from an "acceptable medical source" to establish the existence of an impairment. 20 C.F.R. § 404.1521. In the briefing, Goss's attorney also frequently refers to the headaches as "migraines" but does not cite to any underlying evidence showing Goss was in fact ever diagnosed with migraines. That's because there does not appear to be any diagnosis in Goss's medical records for migraines, as noted by the ALJ. [A.R. 41.] Instead, the medical records reflect Goss had headaches, which the ALJ found to be a severe impairment. [A.R. 45.] But regardless of how they're defined, Goss asserts the ALJ inadequately considered his headaches.

---

[3] In the final paragraph of the argument section of his brief, Goss states: "The RFC should have accounted for the headaches and more, including as to Goss and his wife's credibility. The ALJ deems the headaches, the fatigue, the groin problems, the obesity, and the status/post foot fractures as each 'severe' during the relevant time period, meaning each needs to line up with limitations in the RFC." [DE 12 at 16.] I do not take these singular references to Goss's obesity, testicular cellulitis or foot fractures as constituting an assertion of error on the ALJ's part in evaluating these impairments. If they were meant as much, they are severely underdeveloped, and the arguments are waived. *Underwood v. Saul*, 805 F. App'x 403, 406 (7th Cir. 2020) (arguments not properly raised in the district court are waived); *Pike v. Colvin*, No. 09 C 4351, 2015 WL 6756264, at *3 (N.D. Ill. Nov. 5, 2015) (stating perfunctory and underdeveloped arguments in social security appeals are waived).

Goss argues that the ALJ did not sufficiently address how these headaches were possibly the side-effect of one of Goss's medications. Tellingly, he doesn't say which medication was causing the headaches as a side effect. He only points to two medical records, one from August 2017 and one from September 2017, in which headaches and fatigue are noted as "possible adverse medication effects." [A.R. 711-15, 1173.] They do not specify any particular medicine that may have caused Goss's headaches either, and they do not indicate that any of his medications were changed as a result. He continued to be prescribed Topamax and Flexeril to treat the headaches and they seemed to treat his headaches "at least fairly well." [A.R. 711-15, 45.] Goss's records from March 2017 state he denied headaches as a side effect of his hypertension medication. [A.R. 727.] The September 2017 records also indicate that Goss reported fatigue and headache as his "primary symptoms" from his diabetes. [A.R. 1173.] Furthermore, during a February 2018 medical visit for his obesity and diabetes, chronic headaches were noted as associated symptoms of Goss's binge eating disorder and his hypoglycemia. [AR 1157.]

Frankly, I can't understand what Goss believes the ALJ should have done differently here. The ALJ did not deny that Goss had headaches, and thus there does not appear to have been any reason for the ALJ to discuss how Goss's headaches were a side effect of his medication. As seen from the medical records, it seems Goss's doctors thought there were multiple possible causes of his headaches: his medications, his diabetes, and his binge-eating. But even if a failure to discuss these causes were an

error, it would be harmless, as the ALJ found them to be a severe impairment and discussed them at length.

Goss next argues that the ALJ had made an improper "implicit assertion that the headaches lack sufficient objective evidence." [DE 12 at 14.] Again, it is unclear what Goss is arguing because the ALJ recognized headaches as a severe impairment. Goss says that "[a] physician can diagnose a migraine condition, for example, on the basis of medical history, a review of symptoms, and a physical and neurological examination." [DE 12 at 14.] He further says that testing, such as a CT scan, is ordered generally to rule out other causes and is not the *sine qua non* of diagnosing migraines. [*Id.*] He thus takes issue with the ALJ's reference to Goss's CT scan in December 2016 being generally negative for any specific cause of Goss's headaches. [A.R. 45, 506.] Goss says that this reference to the CT scan shows the ALJ impermissibly "played doctor." I disagree.

It is true that that a CT scan is not the be all and end all of diagnostics. When an ALJ impermissibly uses a "normal" CT scan to undercut an actual medical professional's diagnosis of migraines, there's an issue of the ALJ "playing doctor," and that's a basis to reverse the decision. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("No doctor ever suggested that the MRI evidence meant anything about Moon's migraines, and for good reason. Doctors use MRIs *to rule out other possible causes of headache*—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis."). But the ALJ didn't do that here. No doctor ever diagnosed Goss with migraines or suggested he had migraines—the medical records

-11-

reflect headaches and tension headaches. And the ALJ accepted this diagnosis of headaches. The ALJ simply referenced the CT scan as a piece of evidence which did not support Goss's testimony concerning the frequency and severity of the headaches. *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). That isn't a reversible error, especially where the ALJ noted other gaps in the objective evidence which led him to disbelieve the severity of the headaches as testified to by Goss.[4]

At bottom, the ALJ did not find Goss credible when it came to his testimony that he suffered from debilitating headaches three to four times a week since 2016. And the decision lays out the reasoning for that finding; namely that there were no medical records indicating Goss's headaches were that severe—or that he ever told any doctor they were that severe—and the fact that Goss's activities of daily living did not seem impaired by his headaches. [A.R. 43-44.] Because Goss does not point me to evidence which clearly undermines those findings, it was not "patently wrong" and shouldn't be overturned. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("An ALJ may disregard a claimant's assertions of pain if he validly finds her incredible."). Without

---

[4] While the ALJ did not rely on this fact and thus it is not a basis by which to affirm the written decision, it's worth mentioning that neither Goss nor his wife mentioned headaches as a condition which prevented him from working when he was applying for benefits. [*See* A.R. 216, 231-39, 243, 258-265.]

something in the record beyond Goss's testimony that headaches would cause him to miss work or otherwise meaningful impair his ability to work, there was no need for the ALJ to have incorporated any additional limitation in the RFC on account of them.

Next, Goss argues that the ALJ erred by not finding his headaches were connected to his diabetes, not finding his diabetes to be a severe impairment and not sufficiently incorporating his diabetes into the RFC to the extent Goss's diabetes made him a "slow healer." [DE 12 at 12-13.] On the connection between his diabetes and headaches, Goss's briefing is again rather confusing. It's unclear what the actual error he is asserting on the ALJ's part. The ALJ agreed Goss had severe headaches, and so I don't see how it was an error on the ALJ's part not to discuss that those headaches may have been caused by Goss's diabetes. Like the medication side-effect discussion above, this argument would only make sense if the ALJ found Goss did not suffer from headaches, or that they weren't severe.

Goss's next argument seems to be that the ALJ erred in finding that Goss's diabetes was not a severe impairment or accounted for in the RFC. [DE 12 at 12 ("The ALJ deems diabetes to not be 'severe,' and gives some playing-doctor style reasons for that being the case, but never mind the speciousness of the ALJ's too-quick syllogism about diabetes: even as a non-severe-impairment, it must be accounted for in the RFC, including in combination with other impairments.").] He takes issue with the ALJ using the fact that Goss's A1C level was generally eight percent or less to find Goss's diabetes was not severe. But that is a general medical guideline for whether an individual's

-13-

diabetes is controlled or not. "An A1C level of 6.5 percent or higher on two separate occasions shows that you have diabetes. An A1C level above 8 percent means that your diabetes is not well-controlled, and you have a higher risk of developing complications of diabetes." Mayo Clinic, "A1C Test" at https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643 (last visited July 30, 2020). And Goss's medical records from March 2016 to April 2018 show A1C values between 6.5 and 8, but never above 8. [A.R. 343, 406, 451, 522, 732, 734, 1143, 1160.] Goss's medical records from March 2017 states his diabetes is "type 2, insulin requiring diabetes without complications" but there are indications his blood sugar was high. [A.R. 727-28.] But that's it. Without anything to the contrary in Goss's medical records, the ALJ's reasoning as to whether Goss's diabetes was severe or non-severe is supported by substantial evidence.

In any event, "[a] failure to find an impairment severe is 'of no consequence with respect to the outcome of the case' if the ALJ recognized other severe impairments, proceeded to later steps, and considered the nonsevere impairments at later steps." *Hays v. Berryhill*, No. 2:18-cv-129-JVB-JEM, 2019 WL 3183619, at *2 (N.D. Ind. July 15, 2019) (quoting *Castile v. Astrue*, 617 F.3d 923, 9237 (7th Cir. 2010)). Goss does not point to any limitations associated with Goss's diabetes which were not included and based in evidence from the underlying record. His brief emphasizes that his diabetes made him a "slow healer" but that does not appear to be based on anything in the medical records. As the ALJ noted, his records from May and June 2017 relating to his recovery

-14-

after his scrotal cellulitis-related surgeries indicate he was adequately healing. [A.R. 696 ("No dressings necessary now that grafts have healed); *id.* at 742 ("On exam today, his graft seems to look quite well … I do not see any signs of infection.").]

At best, I gather from Goss's brief that he is arguing that because of the combination of his diabetes (including the reasonable but unsupported speculation he was a "slow-healer" as a result) and headaches, Goss would have continued to have chronic absenteeism or an inordinate amount of time off-task, akin to his status around the time of his surgeries. The problem is that he does not point to any underlying medical evidence which would support that contention. While an ALJ must consider the combined or aggregate effects of both severe and non-severe impairments, it is still Goss "who bears the burden of proving that [he] is disabled, and [he] failed to present any medical evidence linking [his diabetes and headaches] to the unacceptable level of absenteeism [he] alleges." *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(A) and 20 C.F.R. § 404.1512(a)). And "none of [Goss's] treating physicians opined that [he] was incapable of working" after May 4, 2017. *Id.*

## Conclusion

For the foregoing reasons, the decision of the ALJ denying Anthony Goss's application for Social Security disability benefits after May 4, 2017 is AFFIRMED. The Clerk is DIRECTED to enter judgment for the defendant and close the case.

SO ORDERED on August 7, 2020.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT